## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | **Chapter 13** |
| | : | |
| **ARLENE J. HAWKINS,** | : | |
| | : | **Bankruptcy No. 18-16784-AMC** |
| DEBTOR | : | |
| | : | |
| **ARLENE J. HAWKINS,** | : | |
| | : | |
| PLAINTIFF | : | |
| | : | **Adv. Proc. No. 19-00040-AMC** |
| V. | : | |
| | : | |
| **SANTANDER BANK, F/K/A** | : | |
| **SOVEREIGN BANK,** | : | |
| | : | |
| DEFENDANT | : | |

Ashely M. Chan, United States Bankruptcy Judge

## OPINION

### I.  INTRODUCTION

In this adversary proceeding, the debtor, Arlene J. Hawkins ("Debtor"), seeks a determination that the second mortgage against her principal residence is wholly unsecured pursuant to 11 U.S.C. § 506(a), because the first mortgage on her principal residence exceeds the property's value. As set forth below, the Court finds that the Debtor has established that the unpaid balance on the Debtor's first mortgage exceeds the value of her residence. Therefore, the Court concludes that the Debtor's second mortgage is wholly unsecured.

## II.    FACTS AND PROCEDURAL BACKGROUND

### A. Background

The Debtor owns and resides at 25 Berger Road, Easton, Pennsylvania ("Property"), a

119-year-old home built in 1900. Joint Pre-Trial St. Pt. II ¶ 1; Ex. P-1 p. 1; Ex. D-1 p. 1. The

Property is situated on a 24,829 square foot lot in the Glendon Borough section of Easton, a

residential neighborhood. Ex. P-1 p. 1; Ex. D-1 p. 1. The Property consists of seven rooms,

including four bedrooms and one and a half bathrooms, and has an open front porch, an enclosed

back porch, an unfinished basement, and a two-car driveway. Ex. P-1 p. 1; Ex. D-1 p. 1.

On March 2, 2006, the Debtor, jointly with non-debtor, Donald Hawkins ("Mr.

Hawkins"), executed a note and mortgage against the Property in favor of Santander Bank, f/k/a

Sovereign Bank ("Santander"), in the amount of $130,000 ("First Mortgage"). Proof of Claim

#5. Subsequently, on September 21, 2007, the Debtor and Mr. Hawkins entered into a home

equity line of credit with Santander which had a $25,000 credit limit secured by a second

mortgage against the Property in favor of Santander ("Second Mortgage"). Pre-Trial St. Pt. II ¶5;

Proof of Claim # 6.

On October 11, 2018, the Debtor commenced a voluntary chapter 7 bankruptcy case.

Case No. 18-16784 ECF Doc. ("ECF") 1. The case was subsequently converted to a chapter 13

bankruptcy case on November 29, 2018. *Id.* at ECF 21. A chapter 13 plan was filed on

November 30, 2018. *Id.* at ECF 26. On January 17, 2019, Santander filed a secured proof of

claim in the amount of $113,689.09 in connection with the First Mortgage. Pre-Trial St. Pt. II ¶8;

Proof of Claim # 5. On the same date, Santander filed a secured proof of claim in the amount of

$24,794.46 in connection with the Second Mortgage. Pre-Trial St. Pt. II ¶ 9; Proof of Claim #6.

On February 27, 2019, the Debtor initiated this adversary proceeding against Santander, requesting that the Court determine the Second Mortgage to be wholly unsecured. Case No. 19-00040 ECF 1; Compl. ¶¶ 9, 10, 11. On March 13, 2019, Santander filed an answer denying that the balance due on the First Mortgage exceeds the value of the Property. Case No. 19-00040 ECF 5; Ans. ¶¶ 6, 8-11. On July 12, 2019, the Debtor filed the parties' joint pre-trial statement. Case No. 19-00040 ECF 16. Santander filed an identical pre-trial statement on July 15, 2019. *Id.* at ECF 17. The pre-trial statement describes the only fact in dispute as "the value of the subject Premises" and the only legal issue presented as "the value of the subject Premises." Pre-Trial St. Pt. III ¶ 1, Pt. V ¶ 1.

## B. The Trial

Trial in this adversary proceeding was held and concluded on October 4, 2019. Case No. 19-00040 ECF 21. The Debtor offered into evidence an appraisal report opining that, as of June 3, 2019, the Property had a fair market value of $105,000 ("Debtor's Appraisal"). Ex. P-1 p. 2. Jon D. Markley ("Mr. Markley") prepared the Debtor's Appraisal and testified as an expert witness in general real estate appraisal. *See* Pre-Trial St. Pt. VI ¶ 1; Trial Tr. 7:11-14, Oct. 4, 2019 ("Trial Tr."). Santander offered into evidence its own appraisal report opining that, as of April 2, 2019, the Property had a fair market value of $131,000 ("Santander's Appraisal"). Ex. D-1 p. 2. Michael R. Laudone ("Mr. Laudone") prepared Santander's Appraisal and testified as an expert witness in general real estate appraisal.[1] *See* Pre-Trial St. Pt. VI ¶ 2; Trial Tr. 54:14-16, 55:20-22. Both appraisers used the "sales comparison approach" methodology for valuing the Property. Ex. P-1 p. 2; Ex. D-1 p. 2. This method involved the experts choosing several recent sales they considered "comparable" to the Property and making adjustments to those sale prices

---

[1] Neither expert witness suggests that any material change in value occurred between the two valuation dates.

on account of perceived differences between the comparable properties and the Property. Trial

Tr. 8:3-5, 58:22-59:4. *See also Lauer v. St. Edmond's Fed. Sav. Bank (In re Lauer)*, Bankr. No.

10-16500, Adv. No. 10-0422, 2011 Bankr. LEXIS 1746, at *8 (Bankr. E.D. Pa. May 9, 2011).

### 1. Debtor's Property

The Property is located in Glendon Borough, an established residential neighborhood in

Northampton County with homes of varying sizes. Ex. P-1 p. 1; Ex. D-1 Add. p. 2. The Property

sits in front of a local landfill and is about 100 yards adjacent to an overpass for Interstate 78,

which is visible from the Property. Ex. P-1 p. 1; Ex. D-1 Add. p. 2; Trial Tr. 10:11-14. The

Debtor has made no updates to the Property in the last fifteen years. Ex. P-1 p. 1; Ex. D-1 p. 1.

Accordingly, both appraisals gave the Property a "C-5" condition rating,[2] meaning:

> the improvements feature obvious deferred maintenance and are in need of some
> significant repairs. Some building components need repairs, rehabilitation, or
> updating. The functional utility and overall livability is somewhat diminished due
> to condition, but the dwelling remains useable and functional as a residence.[3] Ex.
> P-1 p. 1-2; Ex. D-1 p. 1, 7.

---

[2] Mr. Markley explained that he had made a typographical error on page one of his appraisal when he described the
condition of the Property as "C-4." Trial Tr. 12:3-13:10. In fact, on the grid on page two of the appraisal comparing
the sales he selected to the Property, he labeled the condition of the Property as C-5. Ex. P-1 p. 2. Accordingly, the
Court accepts Mr. Markley's representation that his C-4 designation on page one of his report was a mere
typographical error and that he intended to give the Property a C-5 designation on that page.

[3] A C-1 rating means "[t]he improvements have been very recently constructed and have not previously been
occupied. The entire structure and all components are new and the dwelling features no physical depreciation." Ex.
D-1 p. 7.

A C-2 rating means "[t]he improvements feature no deferred maintenance, little or no physical depreciation, and
require no repairs…dwellings in this category either are almost new or have been recently completely renovated and
are similar in condition to new construction." *Id.*

A C-3 rating means "[t]he improvements are well maintained and feature limited physical depreciation due to
normal wear and tear. Some components, but not every major building component, may be updated or recently
rehabilitated. The structure has been well maintained." *Id.*

A C-4 rating means "[t]he improvements feature some minor deferred maintenance and physical deterioration due to
normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building
components/mechanical systems and cosmetic repairs. All major building components have been adequately
maintained and are functionally adequate." *Id.*

A C-6 rating means "[t]he improvements have substantial damage or deferred maintenance with deficiencies or
defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The
improvements are in need of substantial repairs and rehabilitation, including many or most major components." *Id.*

The pictures of the Property attached to both appraisals show that the Property, especially the interior, is dilapidated and very poorly maintained. *See* Ex. P-1 Subj. Photo Page p. 1-7; Ex. D-1 Subj. Prop. Photo Add. p. 1-3.

### 2. Debtor's Appraisal and Appraiser Testimony

Mr. Markley testified that he has been a certified general appraiser since 2010,[4] holds general appraiser licenses in both Pennsylvania and New Jersey, is familiar with Glendon Borough and the surrounding area, typically performs around 400 appraisals per year, and regularly conducts appraisals for a variety of clients, including banks, individuals, attorneys, and estates. Trial Tr. 6:2-7:12. In preparing the Debtor's Appraisal, Mr. Markley inspected the Property, including the interior, which he measured as having 1,584 square feet of gross interior living area, took photos, noted the Property's condition, abnormalities, and amenities, searched public records for taxes and lot size, examined the market to find sales of similar properties, and compared those sales to the Property. *Id.* at 8:19-9:8; Ex. P-1 p. 2-4, Subj. Photo Page p. 1-7, Building Sketch p. 1. Mr. Markley testified that, when selecting comparable properties, he generally finds it important to focus on sales occurring within a mile of the subject property in a similar neighborhood as close in time to the appraisal as possible. Trial Tr. 9:14-22. For this Property, he found it especially important to focus on sales from the same borough as the Property given "the unique nature" of Glendon Borough. *Id.* at 15:23-25.

There were only four sales of residential real estate in Glendon Borough in the past year and none actively listed for sale at the time Mr. Markley conducted the appraisal.[5] *Id.* at 9:22-23, 38:5-6. Mr. Markley used the following three properties, all located in Glendon Borough, which

---

[4] Although Mr. Markley's license had been set to expire on June 30, 2019, the Court fully credits Mr. Markley's testimony that he has since renewed it. Trial Tr. 30:15-19.
[5] Due to the small sample size of sales in Glendon Borough, Mr. Markley was forced to use sales data over 90 days old for his analysis.

he determined to be similar to the Property, for his comparison[6] ("Debtor's Comparables"): (1) 15 3rd Street, Glendon, Pennsylvania ("3rd Street Property"),[7] which sold for $112,000 on October 31, 2018, is located .24 miles from the Property, and had a C-4 condition rating; (2) 136 Main Street, Glendon, Pennsylvania ("Main Street Property"),[8] which sold for $104,000 on September 28, 2018, is located .55 miles from the Property, and had a C-4 condition rating; and (3) 201 High Street, Glendon, Pennsylvania ("High Street Property"),[9] which sold for $153,000 on January 16, 2019, is located .77 miles from the Property, and had a C-3 condition rating.[10] Ex. P-1 p. 2.

In a grid comparing the Debtor's Comparables to the subject Property, Mr. Markley adjusted the sales price of each of the Debtor's Comparables to account for differences between the properties, such as lot size, room count, gross living area, condition rating, the existence of amenities such as a finished basement, garage, deck, or patio, and other variables. *Id.* As a result

---

[6]    The Debtor's Appraisal references seven total sales which Mr. Markley could have potentially used for purposes of his comparison. Ex. P-1 p. 2. Three of them are located in Williams Township, a neighborhood which has seen an increase in new construction homes. Trial Tr. 32:6-12, 43:5-24. Mr. Markley preferred to use properties which are located in the same borough as the Property, noting that Glendon Borough properties "would be far more accurate in determining value." *Id.* at 32:11-12.
        One additional sale from the past year, 116 Main Street, Glendon, Pennsylvania, is located in Glendon Borough. *Id.* at 33:1-3. Mr. Markley did not use this property as part of his valuation analysis because he felt the property had certain amenities and features which made it too dissimilar to the subject Property. *Id.* at 32:16-25.
[7] The 3rd Street Property is 119 years old, is situated on a 3,960 square foot lot, and has 1,555 square feet of gross living area. Ex. P-1 p. 2.
[8] The Main Street Property is 99 years old, is situated on a 19,845 square foot lot, and has 1,375 square feet of gross living area. Ex. P-1 p. 2.
[9] The High Street Property is 119 years old, is situated on a 10,494 square foot lot, and has 1,360 square feet of gross living area. Ex. P-1 p. 2.
[10] On cross examination, Santander attempted to attack Mr. Markley's credibility by pointing out that, while his Supplemental Addendum states that "[one] pending sale or active listing is included to [sic] for each comparable that exceeds the desired 90 day time period justify [sic] the subject's estimated value," Mr. Markley did not include any pending sales or active listings as comparable properties. *See* Ex. P-1 Supp. Add. p. 1 ¶ 1; Trial Tr. 37:1-38:14. It is clear to the Court that the Supplemental Addendum contains standard language explaining the general scope of Mr. Markley's services to his clients. Obviously, Mr. Markley could not include any active listings or pending sales because there were none in Glendon Borough at the time he conducted his appraisal. Trial Tr. 38:13-14. The two properties listed for sale which are referenced at the top of page two of the Debtor's Appraisal are both in Williams Township, not Glendon Borough. Therefore, that Mr. Markley was unable to include pending sales or active listings in Glendon Borough to support the estimated value of the Property does not negatively impact the Court's assessment of Mr. Markley's credibility.

of the adjustments, Mr. Markley concluded that each of the Debtor's Comparables were subject to the following net changes: (1) a total net decrease of $5,665[11] to the 3rd Street Property, which resulted in a value of $106,335; (2) a total net decrease of $540[12] for the Main Street Property, which resulted in a value of $103,460; and (3) a total net decrease of $18,740[13] for the High Street Property, which resulted in a value of $134,260.[14] *Id.*

Notably, while Mr. Markley made a $10,000 downward adjustment to the price of the High Street Property to account for the C-3 condition rating, he did not make downward adjustments to the 3rd Street Property or Main Street Property for their C-4 ratings. *See id.* He found it unnecessary given his other adjustments. Trial Tr. 20:20-24. If he had adjusted for the C-4 condition ratings, it would have reduced the adjusted prices of the 3rd Street Property and Main Street Property by $5,000 each. *Id.* at 20:25-21:6. *See* Ex. D-1 p. 2 (adjusting $-5,000 for properties with C-4 ratings); Ex. P-1 p. 2 (adjusting $-10,000 for property two condition ratings higher than subject Property). Furthermore, Mr. Markley explained that, because the Property's

---

[11] Mr. Markley made the following adjustments to the 3rd Street Property: a $-5,000 adjustment based on the Property's inferior location; a $+2,400 adjustment based on the Property's superior site size; a $-2,500 adjustment based on the additional bathroom in the 3[rd] Street Property; a $+435 adjustment based on the slightly superior interior square footage of the Property; and $-1,000 adjustment based on the 3[rd] Street Property's wooden deck and porch. Ex. P-1 p. 2.

[12] Mr. Markley made the following adjustments to the Main Street Property: a $+575 adjustment based on the subject Property's slightly larger lot; a $+1,250 adjustment based on the fact that the subject Property has more rooms; a $+3,135 adjustment based on the superior interior square footage of the Property; a negative $8,000 adjustment based on the Main Street Property having a three-car garage and six-car driveway; and a $+2,500 adjustment based on the Main Street Property only having a patio. Ex. P-1 p. 2.

[13] Mr. Markley made the following adjustments to the High Street Property: a $-3,000 adjustment for the "seller concession," a "gimmick" which allows the borrower to finance a portion of the closing costs; a $-5,000 adjustment based on the High Street Property's superior location; a $+1,650 adjustment based on the Property's superior site size; a $-10,000 adjustment based on the High Street Property's superior condition rating; a $+1,250 adjustment based on an additional half bathroom in the subject Property; a $+3,360 adjustment based on the Property's superior interior square footage; a $+2,500 adjustment based on the lack of basement in the High Street Property; a $-2,500 adjustment due to the central air condition in the High Street Property; a $-5,000 adjustment based on the High Street Property having a two-car garage and four-car driveway; a $-1,000 adjustment based on the High Street Property having a wood deck/patio; and a $-1,000 adjustment based on the High Street Property's porch. Ex. P-1 p. 2; Trial Tr. 20:3-8.

[14] Because Mr. Markley finds listing prices highly speculative and unreliable, he did not investigate the underlying circumstances of the sales to determine why some may have sold for less than asking price. Trial Tr. 31:9-14, 36:6-19, 45:15-21.

proximity to Interstate 78 negatively affects its value, he made negative adjustments for location to the 3rd Street Property and High Street Property which do not have similar locational adversities. Trial Tr. 10:15-18, 17:5-9, 20:10-11. He made no adjustment for location to the Main Street Property because it has its own locational adversity of being in a flood zone. *Id.* at 18:25-19:3.

After adjusting the prices of the Debtor's Comparables, Mr. Markley assigned them what he deemed appropriate weight based upon his view of their similarities and differences to the subject Property. *Id.* at 22:1-11, 46:2-10. He assigned the most weight to the 3rd Street Property and the Main Street Property and the least weight to the High Street Property. *Id.* at 22:5-18. Based upon the weight given to the Debtor's Comparables, he calculated $105,000 as the value of the Property. *Id.* at 22:1-20.

In describing the condition of the Property, Mr. Markley testified that part of the Property's roof needs to be replaced due to deterioration from water damage. *Id.* at 8:19-9:1, 15:9-13. His appraisal supports this, stating that:

> [t]here are several items of deferred maintenance and physical deficiencies that affect the livability, soundness or structural integrity of the subject property. The roof needs replacing…sofet [sic] is in poor condition and most of the second floor ceiling is water damaged. Ex. P-1 p. 1.

In fact, Mr. Markley testified that the water damage to the second floor ceiling had caused multiple ceiling tiles to fall down, leaving holes in the ceiling reflected in photographs of the Property. Trial Tr. 15:11-13. *See also* Ex. P-1 Subj. Photo Page p. 3-5. With regard to the condition of the soffit, Mr. Markley elaborated in his testimony that the soffit in the northwest corner is so deteriorated that it needs to be replaced. Trial Tr. 8:24-9:1. Based on his own personal experience, Mr. Markley estimated that it would cost between $8,000 and $12,000 to

cure all the aforementioned deficiencies in the Property and bring the Property's condition rating to a C-4. *Id.* at 15:14-18.

When asked to comment on Santander's Appraisal, which will be discussed *supra*, Mr. Markley testified that some of the comparable properties used in Santander's Appraisal are located in Wilson Borough, a much more attractive, desirable borough which has a hospital, shopping centers, and other amenities that Glendon Borough does not have. *Id.* at 23:3-21, 27:11-16. Wilson Borough also has a much larger population of 48,000 compared to Glendon Borough's population of 300 and, as a result, more municipal services are available in Wilson Borough than in Glendon Borough. *Id.* at 27:17-23, 28:3-8. Because of these significant disparities, Mr. Markley testified that properties in Wilson Borough regularly sell for much higher prices than similar homes in Glendon Borough and that Wilson Borough and Glendon Borough are not comparable neighborhoods. *Id.* at 23:5-6, 27:14-16.

After Santander raised on cross examination that the Northampton County assessed value of the Property for real estate tax purposes is $148,473, Mr. Markley explained that county tax assessments are generally not reliable indicators of actual market value, as they do not take into consideration property improvement or degeneration. *Id.* at 34:24-35:4, 44:22-24. In fact, county assessors do not perform interior inspections at all. *Id.* at 47:13-23. Ultimately, in Mr. Markley's view, counties depend on tax assessments to meet their budgetary needs and are generally not as concerned with accurately capturing a property's actual value. *Id.* at 44:13-21. With respect to this Property, Easton has not performed a new assessment in over twenty years, making the assessment associated with this Property a particularly poor indicator of the Property's value. *Id.* at 44:20-21, 47:24-48:1.

### 3. Santander's Appraisal and Appraiser Testimony

Mr. Laudone testified that he has been a certified general appraiser since 1999 and holds

general appraiser licenses in both Pennsylvania and New Jersey. Trial Tr. 52:1-53:5. On average,

he conducts approximately 200 residential appraisals per year with about 70% of his appraisals

performed for banking purposes. *Id.* at 53:7-54:5. In preparing his appraisal report, Mr. Laudone

also inspected the Property, including the interior, which he measured as having 1,618 square

feet of gross interior living area,[15] took interior and exterior photos, measured the improvements,

took note of the overall condition, quality of construction, and layout, searched public records for

taxes and lot size, examined the market to find sales of similar properties, and compared those

sales to the Property. *Id.* at 56:20-57:2; Ex. D-1 p. 2, Floorplan Sk. p. 1.

Ultimately, Mr. Laudone used the following four properties, which he determined were

similar to the Property ("Santander's Comparables"),[16] in his comparison: (1) 1955 Fairview

Avenue, Easton, Pennsylvania ("Fairview Avenue Property"), which sold for $128,500 in

January 2019, is located 1.83 miles from the Property in Wilson Borough, and had a condition

rating of C-5;[17] (2) 1931 Washington Boulevard, Easton, Pennsylvania ("Washington Boulevard

Property"), which sold for $122,500 in January 2019, is located 1.70 miles from the Property in

Wilson Borough, and had a condition rating of C-4;[18] (3) 2711 Northampton Street, Easton,

---

[15] The Court considers the minor difference in how the appraisers measured the interior square footage of the Property largely immaterial. When asked to speculate regarding what accounted for the difference in the two appraisers' measurements, Mr. Laudone explained:

> [w]ell, I measured the interior – I mean the exterior of the building with a tape where I basically take the tape and I attach it to the exterior of the building and run it along the side of the home. The – that works great for the first floor. However, for the second floor, there's some dormers, and basically the rule of thumb is you measure from the floor up to the ceiling, and then across the walls. And that – the second level was partially measured from the interior as well. Trial Tr. 57:5-18.

[16] Mr. Laudone was also forced to use some sales data over 90 days old for his analysis.

[17] The Fairview Avenue Property is 99 years old, is situated on a 5,200 square foot lot, and has 1,568 square feet of gross living area. Ex. D-1 p. 2.

[18] The Washington Boulevard Property is 119 years old, is situated on a 3,900 square foot lot, and has 1,704 square feet of gross living area. Ex. D-1 p. 2.

Pennsylvania ("Northampton Street Property"), which sold for $125,000 in June 2018, is located 2.09 miles from the Property in Palmer Township, and had a condition rating of C-6;[19] and (4) the Main Street Property. Ex. D-1 p. 2, Add. p. 3.

In a grid comparing all of Santander's Comparables, except for the Main Street Property[20] which was missing from the grid, to the subject Property, Mr. Laudone adjusted the sales price of Santander's Comparables to account for differences between the properties, such as location, lot size, room count, gross living area, the existence of amenities such as a finished basement, garage, or porch, and other variables. Ex. D-1 p. 2. As a result of the adjustments, Mr. Laudone concluded that Santander's Comparables were subject to the following net changes: (1) a total net increase of $2,000 to the Fairview Avenue Property, which resulted in a value of $130,500;[21] (2) a total net increase of $10,500 to the Washington Boulevard Property, which resulted in a value of $133,000;[22] and (3) a total net increase of $7,000 to the Northampton Street Property, which resulted in a value of $132,000.[23] *Id.* Despite the Main Street Property being omitted from the grid, Mr. Laudone testified that his adjustments to the Main Street Property

---

[19] The Northampton Street Property is 89 years old, is situated on an 8,750 square foot lot, and has 1,697 square feet of gross living area. Ex. D-1 p. 2.

[20] Strangely, the grid comparing the Property to the Santander Comparables does not include the Main Street Property. *See* Ex. D-1 p. 2. However, an addendum to the report does mention using the Main Street Property as the fourth comparable. *See* Ex. D-1 Add. p. 3. Santander's counsel claims to have inadvertently omitted the page showing the Main Street Property on the Santander Comparables grid. Trial Tr. 63:10-64:17.

[21] Mr. Laudone made the following adjustments to the Fairview Avenue Property: a $+3,000 adjustment for the superior lot size of the Property; a $-4,000 adjustment based on the Fairview Avenue Property having a two-car garage; and a $+3,000 adjustment based on certain exterior amenities. Ex. D-1 p. 2.

[22] Mr. Laudone made the following adjustments to the Washington Boulevard Property: a $+15,000 adjustment to account for the fact that the seller was motivated and accepted an offer below market value under duress; a $+3,000 adjustment based on the Property's superior lot size; a $-5,000 adjustment based on the superior condition rating of the Washington Boulevard Property; a $-1,500 adjustment based on the Washington Boulevard Property having more rooms; a $-4,000 adjustment based on the Washington Boulevard Property having a two-car garage; and a $+3,000 adjustment based on exterior amenities. Ex. D-1 p. 2.

[23] Mr. Laudone made the following adjustments to the Northampton Street Property: a $+10,000 adjustment to account for the fact that the executrix of the record owner's estate accepted a cash offer below market value; a $-5,000 adjustment for the Northampton Street Property's superior location in Palmer Township; a $+2,500 adjustment for the Property's superior lot size; a $+5,000 adjustment for the Northampton Street Property's inferior condition rating; a $+1,500 adjustment based on the fact that the Northampton Street Property has more rooms; and a $-4,000 adjustment based on the Northampton Street Property having a two-car garage. Ex. D-1 p. 2.

resulted in a total net increase of $26,500, yielding a value of $130,500.[24] Trial Tr. 85:7-11, 87:6-7.

Mr. Laudone's grid does not reflect any adjustments to the Santander Comparables based on the Property's proximity to the Interstate 78 overpass because the traffic did not make as much noise as he had anticipated when he visited and because he believes that, in a seller's market, the proximity of the overpass would not deter potential buyers.[25] *Id.* at 82:3-5, 82:20-83:15, 84:1-9. *See* Ex. D-1 p. 2. While he also did not make adjustments accounting for the Fairview Avenue Property and Washington Boulevard Property being in Wilson Borough, he did make a $5,000 downward adjustment on account of the Northampton Street Property's superior location in Palmer Township and a $5,000 downward adjustment to the Main Street Property on account of its proximity to train tracks. Ex. D-1 p. 2; Trial Tr. 73:4-12, 86:9-11. After accounting for all the adjustments, Mr. Laudone calculated $131,000 as the value of the Property.[26] Ex. D-1 p. 2; Trial Tr. 75:7-12.

Mr. Laudone testified that, in selecting which properties to use for his comparison, he focused primarily on finding properties similar in square footage and condition rating to the

---

[24] Unfortunately, because the grid did not include the Main Street Property, the Court does not know all adjustments that were made. The Court does know based on Mr. Laudone's testimony that he made at least the following adjustments: a $10,000 "condition of sale" adjustment to account for the fact that based on Mr. Laudone's conversation with the listing agent, the executor of the record owner's estate purportedly accepted a cash offer $10,000 below market value; a $5,000 adjustment based on the Main Street Property's proximity to train tracks; an adjustment of an unknown amount for design style; an adjustment of $1,500 to account for the Main Street Property only having one bathroom; a $4,000 adjustment based on the Main Street Property's inferior square footage; adjustments of an unknown amount for the fact that the Main Street Property does not have a basement but has a garage; and adjustments of an unknown amount for exterior amenities. Trial Tr. 85:18-87:7. Mr. Laudone may have made other adjustments not stated here which he did not mention in his testimony.

[25] Although Mr. Laudone referenced the existence of Interstate 78 in the narrative section of his appraisal, he could not point to any place on the grid where he accounted for Interstate 78's proximity to the Property. Trial Tr. 82:7-83:15.

[26] On cross examination of Mr. Markley, as previously mentioned, Santander tried to suggest that the Debtor's Appraisal was incorrect because it was less than the Northampton County assessed value of the Property for tax purposes. However, Santander's own appraisal also values the Property far below the Northampton County assessed value. *See* Ex. D-1 p. 2. Accordingly, the Court does not view the Northampton County assessed value as sufficiently probative of the actual value of this Property and completely agrees with Mr. Markley that county assessed values generally do not reflect the actual market value for all the reasons he testified.

Property. Trial Tr. 58:22-59:4. He did not find it necessary to limit his search to properties in

Glendon Borough.[27] *Id.* at 58:15-22. He explained that it is permissible to expand the radius of a

search for comparable properties when the number of sales in a given area is very small. *Id.* Mr.

Laudone further testified that he considers homes in Wilson Borough generally very similar to

Glendon Borough homes, especially in age and style. *Id.* at 66:22-67:8, 70:20-23. However,

despite the purported similarity between Wilson Borough homes and Glendon Borough homes,

when asked on cross examination whether he considered Glendon Borough "not a very desirable

place to live," Mr. Laudone responded that "[i]t's an oddball" and Wilson Borough is "not an

oddball." *Id.* 81:12-15. With regard to Palmer Township, where the Northampton Street Property

is located, Mr. Laudone readily admitted that Palmer Township is superior in location to

Glendon Borough, as it features many homes which are newer and larger than those in Glendon

Borough. *Id.* at 73:4-10.

With regard to other notable elements of the Property, Mr. Laudone's appraisal states that

"major items of deferred maintenance include the ceiling damage, peeling paint and the porch

ceiling." Ex. D-1 Add. p. 1 ¶ 4. The report further elaborates that "[t]he interior of the subject

property has evidence of water damage to the ceiling in the dining room, living room, and second

floor rear bedrooms" and that "the ceiling on the front porch was coming down and in need of

repair." *Id.* at Add. p. 2. The report also notes that "the floor and wall coverings were at the end

of their economic life." *Id.* Mr. Laudone did not conclude the roof needed to be replaced because

the Debtor represented to him that the Property did not have an active roof leak at the time of the

inspection. Trial Tr. 91:12-17. Mr. Laudone testified and stated in his report that, based on his

personal experience, repairs to cure the ceiling damage, peeling paint, porch ceiling, and floor

---

[27] He did not select the 3rd Street Property for his comparison because he felt it was too dissimilar in style to the subject Property. Trial Tr. 60:21-61:3.

and wall coverings would cost $6,000 and could upgrade the Property to a C-4 or C-3 rating. *Id.* at 78:4-8. *See also* Ex. D-1 Add. p. 4.

## III.    DISCUSSION

Ultimately, the Debtor is only entitled to relief in this proceeding with respect to the Second Mortgage if the value of the Property is less than the amount owed on the First Mortgage pursuant to 11 U.S.C. § 506(a)(1). The Court finds that, because most of the Santander Comparables are located farther from the Property than the Debtor's Comparables and are located in much better boroughs than the Property, Santander's Appraisal contains some concerning deficiencies, and the Property is obviously in serious disrepair, the Debtor's Appraisal more accurately reflects the value of this Property. Accordingly, the Debtor has met her burden in demonstrating that the value of the Property is less than the First Mortgage and, therefore, the Second Mortgage is deemed wholly unsecured.

### A.    11 U.S.C. § 506(a)

Pursuant to 11 U.S.C. § 506(a)(1),

> [a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest…is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property…and is an unsecured claim to the extent that the value of such creditor's interest…is less than the amount of such allowed claim.

This means that "[i]n general, secured claims can be bifurcated into allowed secured and unsecured components, with the secured claim limited by the value of the collateral." *Mahmud v. JTH Inv. Group, LLC (In re Mahmud),* Bankr. No. 08-10855bf, Adv. No. 08-0175, 2008 WL 8099115, at *3 (Bankr. E.D. Pa. Dec. 4, 2008). However, in chapter 13 cases, § 1322(b)(2) prohibits the modification of "a claim secured only by a security interest in real property that is the debtor's principle residence." *DiMauro v. Wilmington Trust Co. (In re DiMauro),* 548 B.R.

685, 687 (Bankr. D. Del. 2016). *See also In re Mahmud,* 2008 WL 8099115, at *3 ("[a]

recognized exception to this bifurcation principle is found in section 1322(b)(2) of the

Bankruptcy Code. This provision prohibits a chapter 13 debtor from modifying the rights of a

secured creditor who holds only a security interest in the debtor's principal residence.").

The Supreme Court has interpreted § 1322(b)(2) as prohibiting the bifurcation of a

partially undersecured homestead mortgage claim. *Nobleman v. Am. Sav. Bank,* 508 U.S. 324,

332, 113 S. Ct. 2106, 2111, 124 L.Ed. 2d 228 (1993). However, the Third Circuit Court of

Appeals subsequently clarified that § 1322(b)(2)'s antimodification clause does not apply to a

junior mortgage which is wholly unsecured and that the Supreme Court's holding in *Nobleman*

only applies to claims which are at least partially secured.[28] *McDonald v. Master Fin. Inc. (In re*

*McDonald*), 205 F.3d 606, 615 (3d Cir. 2000). Therefore, a chapter 13 debtor may modify a

junior lienholder's rights on a principal residence pursuant to § 506(a) if the junior lienholder's

claim is entirely unsecured. *In re DiMauro,* 548 B.R. at 687 (discussing *McDonald,* 205 F.3d at

615).

Since the Property at issue here is the Debtor's principal residence, the Second Mortgage

can only be treated as wholly unsecured pursuant to § 506(a) if the value of the Property does not

exceed the balance on the First Mortgage.[29] *See Butler v. HSBC Mortg. Servs. (In re Butler),*

---

[28] "A claim is partially unsecured if the value remaining in the collateral after subtracting the balance due on prior liens is less than the unpaid balance of the claim. A claim is wholly unsecured if the unpaid balance of liens senior to the claim exceeds the value of the secured property." *In re Lauer,* 2011 Bankr. LEXIS 1746, at *2 n.1.

[29] 11 U.S.C. § 506(a)(1) of course only intends to allow modification of a secured claim to the extent of the estate's interest in the subject collateral, which would be the debtor's interest in the subject property as of the petition date. *See* 11 U.S.C. § 541. It appears, as mentioned earlier, that a non-debtor, Mr. Hawkins, is or was jointly liable on the First and Second Mortgages with the Debtor. However, neither party in this adversary proceeding has ever explained who Mr. Hawkins is, his relationship to the Debtor, what, if any, interest he may have had in the Property as of the petition date, or whether he may have passed since executing the mortgages. The Court takes judicial notice of the fact that Debtor's Schedule A states that as of the petition date, she was the only person with an interest in the Property. *See* Case No. 18-16784 ECF 16 Schedule A Pt. I; *In re Olick,* 517 B.R. 549, 554 n.7 (Bankr. E.D. Pa. 2014) (stating courts may take judicial notice of the dockets and content of the documents filed in a bankruptcy case for the purpose of ascertaining timing and status of events in the case and facts not reasonably in dispute.). Neither party has ever argued that the Debtor was not the sole owner of the Property as of the petition date. Rather than

Bankr. No. 10-12776, Adv. No. 10-0317, 2010 WL 4736205, at *2 (Bankr. E.D. Pa. Nov. 15, 2010); *In re Mahmud*, 2008 WL 8099115, at *3. If any portion of the Second Mortgage is at least partially secured, the § 1322(b)(2) antimodification provision will apply. Accordingly, the Court must determine whether there is any equity in the Property, after application of the First Mortgage, which could secure the Second Mortgage. If no equity exists in the Property after the First Mortgage, the Second Mortgage may be reclassified as wholly unsecured. The comparison sales approach used by both appraisers is "generally accepted [as] the best evidence of market value in cases where a court must determine the value of real property." *Seidle v. Sovereign Bank (In re Seidle)*, Bankr. No. 1:10-bk-01645MDF, Adv. No. 1:10-ap-00354MDF, 2013 WL 828303, at *3 (Bankr. M.D. Pa. March 6, 2013) (citations omitted) (internal quotation marks omitted).

In the context of a valuation under § 506(a), the party attempting to modify a secured claim, in this instance, the Debtor, bears the initial burden of proof.[30] *In re Heritage Highgate, Inc.,* 679 F.3d 132, 140 (3d Cir. 2012). If the challenging party establishes with sufficient evidence that the proof of claim overvalues a creditor's secured claim because the collateral is of insufficient value, the burden then shifts and the creditor bears the burden of persuasion to demonstrate by a preponderance of the evidence the value of the collateral securing its claim. *Id.*

---

speculate in the absence of any argument by the parties regarding the Property's ownership, the Court will accept the Debtor's statement made under penalty of perjury in Schedule A that she was, as of the petition date, the sole owner of the Property.

[30] Santander has not argued that the Debtor, rather than initiating an adversary proceeding, should have filed a motion to determine the amount of Santander's secured claim under Fed. R. Bankr. P. 3012(b), which provides that:

> a request to determine the amount of a secured claim may be made by motion, in a claim objection, or in a plan filed in a chapter 12 or chapter 13 case. When the request is made in a chapter 12 or chapter 13 plan, the plan shall be served on the holder of the claim and any other entity the court designates in the manner provided for service of a summons and complaint by Rule 7004.

In any event, in filing the adversary proceeding, Santander was provided with more formal process and procedural safeguards than a mere motion. *Bennett v. Bank of Am. N.A. (In re Bennett)*, 531 B.R. 68, 82 n.16 (Bankr. E.D. Pa. 2015) (B.J. Frank). Compelling the Debtor to file a motion instead would have exalted form over substance. *Id.*

at 139-140 ("We now hold that a burden-shifting framework controls valuations of collateral to

decide the extent to which claims are secured pursuant to § 506(a)."). Ultimately,

> [b]ecause the valuation process often involves an analysis of conflicting appraisal
> testimony, a court must necessarily assign weight to the opinion testimony received
> based on its view of the qualifications and credibility of the witnesses. Because the
> valuation of real property is less than exact science, courts are given wide latitude in
> determining value. *Weichey v. NexTier Bank, N.A. (In re Weichey),* 405 B.R. 158,
> 164-65 (Bankr. W.D. Pa. 2009) (citations omitted).

**B.   The Value of the Property**

Based upon the appraisals, pictures, and testimony of Mr. Markley and Mr. Laudone, it

is clear that the condition of the Property is well below average with many significant

deficiencies. The Debtor has deferred substantial maintenance on the Property, causing a

troubling amount of deterioration, disrepair, and damage, especially to the roof and ceiling.

Furthermore, the Property is located in an undesirable borough adjacent to a huge highway

overpass and in front of a landfill. All these factors would undoubtedly deter potential buyers

from even looking at the Property and substantially diminish the Property's value.

Ultimately, the Court's determination turns on the quality of each appraiser's comparable

sales data. The Court finds Mr. Markley's comparable sales data superior to the comparable sales

data used by Mr. Laudone. Mr. Markley's appraisal focused on comparable sales in the same

borough as the Property, whereas Mr. Laudone's appraisal compared the Property to three

properties in much more attractive neighboring boroughs farther from the Property than the

properties Mr. Markely considered, although Mr. Laudone did make a location adjustment for

the property in Palmer Township. Nevertheless, the Court simply cannot give the Santander

Comparables which did not account for the difference in location, particularly the Wilson

Borough Santander Comparables, as much weight as properties which are located in the same

borough as the Property.

As described by Mr. Markley, Wilson Borough has a much larger population than Glendon Borough and offers more amenities than Glendon Borough, resulting in higher sales prices for residential real estate in Wilson Borough than in Glendon Borough. While the Court does not question Mr. Laudone's representation that applicable appraisal standards permitted him to expand his search for comparable properties beyond Glendon Borough, the Court nevertheless finds the Wilson Borough properties simply less probative of the value of this Property than properties located in the same borough, even if the condition of the Wilson Borough Santander Comparables is relatively similar to the Property. In the Court's experience, a premium is placed by potential buyers on proximity to shopping and service accessibility related to a home's location. *See In re Weichey,* 405 B.R. at 163. Accordingly, selection of properties in the same borough as the subject Property provides more support for the value offered. In the Court's view, Mr. Laudone failed to sufficiently account for the extent to which the location of the Property in Glendon Borough impairs its value comparative to properties in Wilson Borough in particular. The Debtor's appraiser was more credible overall on the impact of location on the value of the Property. Furthermore, the Court is satisfied that the Debtor's Comparables were all sufficiently similar to the subject Property, that Mr. Markley made adjustments for most differences, and that Mr. Markley's weighted approach appropriately gave more impact to the comparables with more similarities to the Property.[31]

Additionally, the Court found Santander's Appraisal deficient for other significant reasons. First, Santander's Appraisal did not sufficiently account for the impact of the Property's proximity to Interstate 78, failing to make *any* adjustments for it because the traffic during Mr.

---

[31] Although Mr. Laudone found the 3rd Street Property dissimilar to the subject Property in style, the Court's review of the photograph of the 3rd Street Property and the details about the property's features from the Debtor's grid give the Court no basis to conclude that it was inappropriate for Mr. Markley to include it in his valuation.

Laudone's visit was not as loud as he had expected. It seems to the Court that noise from an interstate will almost certainly vary depending on the time of day. Furthermore, the Court is convinced, despite Mr. Laudone's belief to the contrary, that the appearance of an interstate overpass in proximity to a residence would very likely impair a property's marketability and deter potential buyers from visiting in the first place even in a seller's market. Failing to account for this, not to mention the landfill behind the Property, at all in the comparables grid is concerning. Relatedly, Mr. Laudone's $5,000 positive adjustment for location in connection with the Main Street Property for its proximity to railroad tracks seems, at the very least, too high given the Property's own issues with Interstate 78.

Furthermore, the Court questions how Mr. Laudone could have concluded that only $6,000 worth of repairs could potentially upgrade the Property to a _C-3_ rating. The damage to this home is extensive, with holes in the ceiling, a roof which needs to be at least partially replaced, and a front porch roof which is collapsing. The Court also questions Mr. Laudone's failure to account for the roof needing to be replaced, as Mr. Markley credibly testified, and Mr. Laudone did not contest, that the water damage has caused significant deterioration to the roof, rendering parts of it unstable. While the Court understands the Debtor represented to Mr. Laudone that the Property does not have an active roof leak, it appears that previous leaks have nevertheless resulted in parts of the roof needing to be replaced. Mr. Laudone ignored this in his repair estimate. Ultimately, venturing that only $6,000 could get this dilapidated Property a C-3 rating significantly impairs Mr. Laudone's credibility.

Finally, the Court questions some of Mr. Laudone's adjustments made for the Main Street Property, as the discrepancy from the sale price appears excessive. As discussed earlier, the Court feels that the adjustment based on location was excessive given the subject Property's

19

proximity to Interstate 78 and a landfill. Additionally, Mr. Laudone never mentioned in his testimony any adjustment on account of the Property's inferior condition rating, which certainly would have significantly reduced the adjusted price. Ultimately, because Santander failed to provide a complete grid analysis for the Main Street Property, the Court simply cannot conceive of what other adjustments would have justified such a massive departure from the sale price and cannot give the adjustments made to the Main Street Property as much weight. The Court overall appreciated Mr. Markley's generally more conservative adjustments and believes he could have made even more adjustments to account for the Property's inferior C-5 rating with respect to the 3rd Street Property and the Main Street Property had he found them necessary.[32] Based upon the foregoing, as well as the Property's significant deterioration, the Court concludes that the Debtor's Appraisal is far more reliable than Santander's Appraisal and, therefore, that the value of the Property is $105,000, which is below the $113,689.09 balance on the First Mortgage.

## IV.    CONCLUSION

Thus, the Court concludes that the Debtor's Appraisal and the testimony offered by her appraiser are more persuasive, credible, and accurate than the evidence offered by Santander.[33] Accordingly, the Debtor has met her burden of demonstrating that, as of June 3, 2019, the value of the Property was $105,000, which is less than the balance on the First Mortgage of

---

[32] Given the $-5,000 adjustments Mr. Markley was entitled to make based on the 3rd Street Property's and Main Street Property's superior condition ratings, the Court is convinced that the overall value of the Property would remain well under the $113,689.09 balance on the First Mortgage even if Mr. Markley had adjusted for the fact that the executor of the Main Street Property owner's estate accepted an offer $10,000 below market value, an assertion which this Court has no independent way of verifying.

[33] While investigating the circumstances of the sales could have further enhanced Mr. Markley's credibility, the Court otherwise found his approach more probative of the Property's value and his adjustments more appropriate than those made in Santander's Appraisal. The issues with Santander's Appraisal ultimately outweighed Mr. Markley's failure to investigate the circumstances of each sale.

$113,689.09.[34] Consequently, the Second Mortgage is wholly unsecured for purposes of § 506(a)

and is not protected by the antimodification provision of § 1322(b)(2).

Date: October 25, 2019

_____

Honorable Ashely M. Chan
United States Bankruptcy Judge

---

[34] Courts are divided regarding the appropriate date for valuing collateral to determine whether a junior mortgage should be deemed wholly unsecured, with many torn between the petition date or the date a chapter 13 debtor's plan is confirmed. *Miller v. Citibank, N.A. (In re Miller)*, 558 B.R. 146, 154 n.12 (Bankr. E.D. Pa. 2016); *In re Lauer*, 2011 Bankr. LEXIS 1746, at *5 n.4; *In re Butler*, 2010 WL 4736205, at *2 n.5. The parties in this adversary proceeding, however, have not focused on the proper date, most likely believing no material changes occurred between filing of the petition and the date the valuations were made or will occur by the date the Debtor's chapter 13 plan is confirmed, as both appraisals describe the property values in the Property's location as "stable." Ex. P-1 p. 1; Ex. D-1 p. 1. *See In re Butler*, 2010 WL 4736205, at *2 n.5. Accordingly, without expressing any view on the proper date, the Court has employed the date of the valuation.